**Robert L. Jaffe, Appellee, v. Chicago Warehouse Lumber Company, Appellant.**

**Gen. No. 46,299.**

First Division, First District.
December 13, 1954.
Rehearing denied January 3, 1955.
Released for publication March 7, 1955.

Koven, Koven & Salzman, of Chicago, for appellant; Henry H. Koven, and Paul Homer, both of Chicago, of counsel.

Albert E. Jenner, Jr., Philip W. Tone, and Kenneth J. Burns, Jr., all of Chicago, for appellee; Johnston, Thompson, Raymond & Mayer, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Defendant, Chicago Warehouse Lumber Company, an Illinois corporation, appeals from a decree of the circuit court requiring it to make an accounting to plaintiff of its net profits for the year 1950 and a stated portion of 1951, and to pay plaintiff 25 per cent of such profits as additional compensation for his services.

The complaint, as amended, alleged in substance that plaintiff was employed by S. R. Taxey, president and duly authorized agent of the company, as sales manager at a salary of $125 per week, plus $25 per week for expenses, and in addition thereto a sum of 25 per cent of the annual net profits earned by defendant beginning with the year 1950; that the additional compensation was to be paid plaintiff in a lump sum at the close of each calendar year immediately following the completion of the annual audit of defendant's business, and that in computing the net annual profits the salary of Taxey would be fixed in an amount equal to the aggregate salary and expenses of plaintiff; that plaintiff accepted this offer, withdrew his prior resignation and continued in the employment of defendant as general sales manager and vice president; that he was paid on account of and as an advance of said additional compensation $50 a week from October 1, 1950 to February 5, 1951, and that in addition thereto withdrew

$500 in November 1950; and that defendant refused to give an accounting of its profits in the year 1950 and that portion of 1951 in which services were rendered to it by plaintiff.

Defendant filed its answer to the amended complaint averring in substance that plaintiff was informed by defendant, through its agent, S. R. Taxey, that defendant anticipated a profit in 1950 and intended to give plaintiff a bonus which, when determined by defendant, would be paid in twelve monthly installments during 1951; that plaintiff accepted this gratuitous gesture, but that when he thereafter indicated his dissatisfaction, said offer was withdrawn.

Subsequently defendant had leave to file an additional defense to the amended complaint, averring that the company did not orally or in writing, directly or by implication, authorize Taxey, either as its president or its agent, to make any agreement with plaintiff whereby it would become obligated to pay 25 per cent of its annual net profits to plaintiff. By court order of that same date Taxey was made an additional party defendant, and summons was issued against him but was returned showing said defendant not found.

Plaintiff then filed an amendment to its amended complaint alleging that Taxey acted for and on behalf of defendant in making the alleged oral agreement, or, in the alternative, that if he did not so act he held himself out as so acting and represented himself as the duly authorized agent of defendant expressly authorized to enter into the alleged agreement; and it was urged that if he did not have the requisite authority he became personally liable for the damage suffered by plaintiff.

Upon this state of the pleadings the case proceeded to a trial which is reported in a record of over a thousand pages. It appears that defendant, an Illinois corporation, maintaining its principal office at 201 North Wells street in Chicago, was engaged in the buying

and selling of lumber at wholesale for its own account. It had no warehouse but made purchases and sales of goods in transit. Five thousand shares of $10 par value common stock were issued on organization; of that amount S. R. Taxey subscribed to 3,500 shares; in 1947 Esther S. Taxey, his wife, purchased 1,500 shares of the corporate stock; there were no other stockholders. Prior to the incorporation of the defendant company, the Taxeys were interested in a company known as The 2 x 4 Company, a corporation. Mrs. Taxey testified that upon liquidation thereof she used her share of the proceeds, amounting to $5,000, plus additional funds of $10,000 (the source of which was not disclosed), to purchase stock in the defendant company.

From the inception of the defendant company in 1946 the directors were S. R. Taxey, his wife Esther, and their son Paul who in 1949 was eighteen years old and a student at the University of Chicago. S. R. Taxey was president, Esther Taxey was secretary and treasurer, Herbert Le Vone, the bookkeeper, was assistant secretary in 1948–49, and assistant treasurer in 1950. Paul Taxey held a minor office. Robert L. Jaffe, who was related by marriage to S. R. Taxey, was vice president in 1950 and so remained until he resigned in 1951.

Jaffe's testimony as to the following preliminary matters was substantially undisputed: S. R. Taxey, acting on behalf of The 2 x 4 Company, employed Jaffe in October 1947 to act as treasurer and general manager of the company, of which Taxey was president and principal stockholder. Jaffe's salary was then fixed at $75 per week, and $25 per week expenses; as additional compensation Jaffe was to receive a bonus of one-ninth of the company's net profits for the year 1948, two-ninths for the year 1949, and three-ninths for the year 1950, the bonus for each year to be payable in a lump sum upon completion of the audit at the end of each year. This bonus was provided for in a resolution of the board of directors of The 2 x 4 Company. Jaffe

remained in the employ of that company until about June 1949, when he was employed by Taxey in behalf of the company that is the defendant in this proceeding. Taxey was also president and principal stockholder of that company, and at the time of the trial still held that office and interest in the company. Both companies operated from the same office. Jaffe's employment was as general manager at a salary of $100 and $25 per week expense allowance. He was elected a vice president. His duties with defendant from the outset were to manage all phases of the company's activity, and his duties remained the same from June 1949 until his employment with the company was terminated on February 16, 1951. In the fall of 1949 his compensation was increased to $125 per week, plus $25 per week expense allowance, and so remained during the balance of his employment with defendant.

██ As the two principal grounds for reversal it is urged (1) that plaintiff failed to prove that a contract was entered into between him and defendant for 25 per cent of the annual profits of the corporation, and (2) that in any event plaintiff failed to prove that Samuel R. Taxey had authority to bind the corporation to the contract sued on. To consider these contentions in their reverse order, the questions presented are whether the evidence of Taxey's authority is sufficient to warrant the reasonable inference that the board of directors authorized Taxey to enter into the contract claimed by plaintiff, although no form or minute of their action was made. It is urged by defendant and conceded by plaintiff's counsel that ordinarily the president of a corporation has no authority, in the absence of action by the board of directors, to enter into, on behalf of the corporation, an unusual or extraordinary contract, and that under most circumstances a contract providing for the payment to an officer or employee of a percentage of the net profits of the corporation is

420

to be regarded as unusual or extraordinary. However, there is a well established exception to this rule that when a corporation allows its president to assume complete control over the affairs of the corporation he then does have, prima facie, the power to make just such a contract. This exception to the rule is illustrated in the recent case of Renault v. L. N. Renault & Sons, Inc., 188 F.2d 317 (1951). The trial court in that case held that the fact that the president of a corporation was owner of one-half of its stock did not of itself authorize him to bind the corporation to pay a stale debt; the pertinent issues were, rather, whether the president was acting within the scope of his implied authority, or, if he was not so acting, if his action was ratified by the directors who would have to be in a position of knowledge. The court of appeals, in reversing the judgment of the trial court and remanding the cause for a new trial, pointed out that a promise to pay a stale debt has usually been designated an extraordinary promise not within the president's implied authority, but qualified that general rule by adding that "where one man completely controls a corporation, however, a necessary and logical exception has been carved out of the above rule. In such situation, the one man achieving unrestrained control is held prima facie to have power to do all acts which the Board of Directors could have authorized. [Citing Pennsylvania cases.]" In the Renault case the court of appeals, in concluding that the jury, who had failed to agree on a verdict, could properly have found that the president exercised such control, said: "There is no evidence as to any change in his relation to the corporation in the period 1924–1947. The evidence indicates that, in 1946 and 1947, the corporate picture had not changed materially from the picture in 1924. John D'Agostino, as in 1924, was president. The D'Agostino family, as in 1924, owned all the shares of stock, with the possible excep-

tion of one share. A jury could well find that John D'Agostino, as in 1924, had complete control of the corporation during the years 1946 and 1947."

In Joy v. Ditto, Inc., 356 Ill. 348, the Supreme Court of this state enunciated the same principle applied in the Renault case, holding that when a corporation allows "certain of its officers to manage its business it must be responsible for their acts, unless it is affirmatively shown that these acts were unauthorized." Certain stockholders of the corporation there contended that allegedly secret bonuses paid by the corporation to some of its officers and directors as compensation for services rendered by them as employees of the corporation were improper because they had been paid without authority of the board of directors. There was evidence that the president of the corporation, after conferring with another member of the executive committee of the board of directors, had "decided upon a plan of compensation whereunder these heads of departments would receive a fixed salary and in addition thereto a percentage of the net profits of the business. . . . The fixed salary and the percentage of the net profits to be received in addition thereto were fixed at the close of each year for the following year." Apparently the president, in conference with two other members of the executive committee, fixed salaries and bonuses after the original installation of the plan and, as in the case at bar, the bonus agreements were not mentioned in any resolution or minutes of the board of directors, and it was contended that the board had no knowledge of the agreements. In holding that the officers had authority to enter into the bonus contracts the court said that "it is shown without dispute in the evidence, that from the time he became president it was the fixed custom of Joy and Robinson, with acquiescence on the part of the board of directors and without the participation of the board therein, to determine all questions of policy relating to business,

make all employment contracts· and determine compensation to be paid thereunder and to· have general supervision and management of the business and affairs of the company," and that "it is clear . . . that it was the practice, always followed, to leave all employment and fixing of salaries" to these officers. We think Joy v. Ditto, Inc., adapting the same principle laid down in the Renault case, is the controlling decision in this state and establishes the exception to the rule ordinarily limiting the authority of the president of a corporation in the absence of action by the board to enter into unusual or extraordinary contracts.

Counsel for defendant cites various Illinois cases purporting to hold the contrary, but they may be distinguished, as was Bloom v. Nathan Vehon Co., 341 Ill. 200, in the Joy case, on the ground that the salary there in question was paid to a director as such and not to an employee. The rule of that case, said the court in the Joy case, referring to Bloom v. Nathan Vehon Co., "relates to salaries paid to officers or directors 'as such,' and in this case, if the services rendered for which compensation here was paid were not services required of them as officers or directors but were services rendered as employees of the corporation, then complainants [stockholders seeking to set aside the contracts] may not recover simply because the amount of compensation was not fixed by the board of directors. . . ." The reason for the sanction of the bonus agreement in Joy v. Ditto, Inc., is the same as in the case at bar. Jaffe was a trusted and valuable employee of the corporation, and a bonus arrangement would undoubtedly interest him in the economical operation of his department and in the increase of profits; and it would also avoid carrying large fixed liabilities of the corporation for salaries.

An examination of the record in this case clearly shows that Taxey exercised complete control over all the corporation's affairs. His own testimony was that

he directed and ran the defendant corporation, that he made all managerial decisions for the company which he reported to the board of directors to the extent he chose. He testified that he was authorized to manage and operate the business, and as part of those duties he hired employees at the best terms he could arrange, engaging all employees and fixing the terms of their compensation. The record is replete with statements in Taxey's testimony that in his own mind—as in fact—he and the corporation were one and the same. He invariably used the personal pronoun "I" when he meant the corporation; thus: "I told him . . . I intended giving him a bonus at the end of the year . . ."; "I had in mind giving him a bonus . . ."; "I told him . . . I was not negotiating a contract with him . . . that I had offered a bonus voluntarily . . ."; "I told him . . . I would be glad to advance some money as extra compensation, or to apply against the bonus which I intended to give him at the end of the period of 1950 . . ."; "I offered to give him the $50 a week thenceforth as an advance on the bonus I contemplated giving him . . ."; "I said to him, 'Bob, . . . I . . . want to give you a bonus,' . . ."; "that I would reinstate that subject of a bonus and make it retroactive as of the first of the year. . . ." The foregoing are only some instances of Taxey's constant identification of himself with the corporation that occur on almost every page of his testimony, even after the defense of want of authority had been belatedly interposed in the course of the trial; and indeed it is not difficult to understand why Taxey considers the corporation his alter ego, or why the other directors, his wife and his teenage son, allowed him to maintain complete and unlimited authority over the corporation's affairs. Prior to the incorporation of the defendant, Taxey had been engaged in the wholesale lumber business as a sole proprietor. The defendant corporation took over all the assets and business of the sole proprietorship.

While his wife subscribed to 1,500 of the 5,000 shares issued, Taxey appears to have been the sole stockholder soon after the incorporation. It was not until later that a block of 1,500 shares was placed in the name of Mrs. Taxey, and she testified that her husband "may have bought it for me, and given it to me as a gift."

█ Evidence or, more pertinently, the lack thereof, as to activities of the board of directors further supports this conclusion. Formal meetings of the board were held once a year, and on other occasions when it seemed advisable to formally record action that had been taken. Asked when and where a particular meeting of which minutes appeared in the minute book was held, Taxey replied that he had no recollection—"it was a mere formality, you understand." The minutes of the formal meetings held during 1949, 1950 and early in 1951 were all dictated by Taxey at the same time and during the month following Jaffe's departure from the defendant's employ. These minutes, having previously been revised by Taxey, were not typed until March 1952, approximately six months after the commencement of this suit. There is also testimony by Taxey that the board, i. e., Taxey, his wife and their son, "frequently held innumerable meetings wherein we discussed the Chicago Warehouse Lumber Company's affairs"—at breakfast, luncheon and dinner; those meetings were not formally called as meetings, and no record was made of them. Finally, it appears from Taxey's testimony that the board had never countermanded any action he had taken on behalf of the corporation. There is also the circumstance that Taxey's wife and son had full knowledge of all action taken by him with respect to Jaffe's bonus, as testified to by Taxey himself. With reference to the specific contract claimed by Jaffe to have been made with the corporation, the evidence is clear that Taxey was authorized to enter into the contract. He testified that "anything I did was in behalf of the corporation," and

when asked "and you were authorized to do so?", he answered "I presume so."

The defense of want of authority was interposed after the beginning of the trial, and we are convinced that it was an afterthought; and the evidence pertaining to Taxey's authority and the full extent to which he acted on behalf of the corporation in all matters with the knowledge and consent of his wife and son justified the chancellor in finding that defendant had wrongfully repudiated its contract.

With respect to the question whether Taxey agreed to pay Jaffe 25 per cent of the net profits, as alleged in the amended complaint, there is voluminous—and conflicting—testimony. The chancellor's findings were based largely upon testimony heard in open court. No purpose would be served by an extended review of the contradictory testimony. The chancellor saw and heard the witnesses testify, and at the conclusion of the hearing characterized Taxey, upon whose testimony defendant must chiefly rely, as "one of the most unreliable witnesses" he had ever encountered—"evasive, and many times halting about things . . . he ought to know quickly; never at any time responding quickly to a matter, but always hedging." In contrast Jaffe's testimony was straightforward and logical. He testified that in September 1949 he approached Taxey on the subject of his compensation and pointed out the fact that his bonus agreement with The 2 x 4 Company provided that he was to receive as a lump-sum bonus three-ninths of the profits of that company for the year 1950, or 33⅓ per cent. He told Taxey that inasmuch as the Chicago Warehouse Lumber Company had taken over the business of The 2 x 4 Company, and that the latter had become inoperative, he would not receive a bonus from The 2 x 4 Company, and he therefore wanted some definite understanding regarding a similar bonus arrangement directly with the Chicago Warehouse Lumber Company; and he testified that

Taxey said " 'We will work something out.' " These conversations were repeated in December 1949 and January 1950, and, except for the conflict in testimony as to the manner and time in which the bonus or percentage was to be paid, the evidence leaves no doubt that the chancellor was justified in finding that the agreement for 25 per cent of the net profits was made as Jaffe testified. Knowledge, on the part of his wife and son, of Taxey's commitment to Jaffe is clearly established. The books of the corporation show a bonus, $1,300 paid, $4,700 balance due to plaintiff for the year 1950 in an amount which is approximately 25 per cent of the amount which defendant contended constituted the corporation's net profit for that year; and on its 1950 federal income tax return defendant took a deduction for a bonus in this amount payable to plaintiff.

We have examined the evidence carefully and are convinced that the chancellor's findings, both with respect to Taxey's authority to enter into the agreement and as to the making of the agreement itself, are fully justified by the evidence and the rule of law applicable thereto.

In the course of the trial Sol Goss was called as an adverse witness by plaintiff under section 60 of the Civil Practice Act [Ill. Rev. Stats. ch. 110, § 184; Jones Ill. Stats. Ann. 104.060]. Goss was a certified public accountant, associated under the firm name of Goss and Riskin Company, which rendered services to the defendant in the auditing of its books for the 1950 calendar year accounting period, and also assisted in the preparation of its 1950 federal income tax return. Counsel for defendant objected to Goss being called as an adverse witness, stating that he was not a party or an officer, a director or a managing agent of the defendant corporation. However, the court permitted Goss to testify, and defendant assigns this as error. We agree with defendant's counsel that the court erred in allow-

427

ing this testimony under section 60, but the ruling and the subsequent testimony thereunder were not reversible error inasmuch as Goss's testimony was later supplied and corroborated by Taxey himself.

For the reasons indicated we have reached the conclusion that plaintiff established his case by clear and convincing evidence. The decree of the circuit court should therefore be affirmed, and it is so ordered.

Decree affirmed.

BURKE, P. J. and NIEMEYER, J., concur.