**PUERTO RICO INDUSTRIAL DEVEL-
OPMENT COMPANY, a Corpora-
tion, Plaintiff,**

v.

**J. H. MILLER MANUFACTURING COR-
PORATION, a Corporation,
Defendant.**

**Civ. No. Q-179.**

United States District Court
S. D. Illinois, S. D.

April 20, 1959.

John C. Trussell, Chicago, Ill., Charles Binkert, Quincy, Ill., for plaintiff and counter-defendant.

Inghram & Dittmeyer, Quincy, Ill., for defendant and counter-plaintiff.

POOS, District Judge.

Plaintiff, Puerto Rico Industrial Development Company, a Corporation, hereinafter referred to as Pridco, in its complaint alleges that J. H. Miller Manufacturing Corporation of Puerto Rico, hereinafter referred to as Miller of Puerto Rico, entered into a written lease with it on or about September 23, 1951, on a rental basis of $1,698.27 per month; that Miller of Puerto Rico defaulted in the rental payments from December 1, 1953, to June 30, 1954, totalling $11,887.89, plus an additional $569.24, representing rent adjustments from May 1, 1953 to November 30, 1953, and claimed a total due of $12,457.13 as of June 30, 1954; that the rent was guaranteed in the sum due by J. H. Miller Manufacturing Company, an Illinois Corporation of Quincy, Illinois, hereinafter referred to as Miller of Illinois; that suit was entered against the Miller of Puerto Rico in the Superior Court, San Juan Section of the General Court of Justice of Puerto Rico, which Court entered judgment in the above amount for the rent past due; that in accordance with the process of the court at a marshal's public sale certain property of Miller of Puerto Rico was sold in the amount of $900, and credit allowed against the rent due, thereby reducing the judgment to $11,557.13, leaving this balance due and owing to plaintiff, and that because of the guaranty of the lease and failure of payment by Miller of Puerto Rico, is now due and owing from the defendant. The original lease is attached to the complaint, and was signed Miller of Puerto Rico by John H. Miller, President, and by Miller of Illinois, by John H. Miller, President. It is here pointed out that J. H. Miller was the president of both corporations. The lease is attached to the complaint and has therein in so far as material here, the following clause:

"The performance of the above contract is hereby guaranteed in all its terms and conditions by the 'J. H. Miller Manufacturing Corporation' of Quincy, Illinois, as evidenced

by the signature of its President hereinafter appearing."

The lease was dated September 23, 1951.

The defendant filed an answer, admitting the amount of the rent, but denied that the lease was guaranteed by the defendant or that it was liable for the rent due. It alleges in its first defense that plaintiff seized a sufficient amount of assets of Miller of Puerto Rico, and illegally and wrongfully seized assets of other corporations and parties in an attempt to satisfy said rents, which more than offset and paid in full the rent due under the lease sued on; that through wrongful seizure and negligence in selling said property the proceeds of sale were insufficient to pay the rent sued for; and in the first affirmative defense it sets up the allegation that neither the stockholders or the Board of Directors of defendant, Miller of Illinois, either before or after the execution of the lease between plaintiff and Miller of Puerto Rico, authorized John H. Miller to guarantee the lease in question, and by its second affirmative defense, the defendant under its charter and by-laws had at no time any authority to guarantee the terms and conditions of the lease and that the attempt of John H. Miller to do so on behalf of the corporation was an invalid and ultra vires act.

By way of counterclaim, defendant alleges that it shipped to Miller of Puerto Rico, the defendant, molds and materials to be used in fabricating figures and figurines which were to be shipped back in finished form, and in addition thereto sent funds to Miller of Puerto Rico for the purpose of purchasing supplies and raw materials to be fabricated into finished products for the defendant; that at no time did the title to said molds, plaster, paint and other supplies and raw materials, or the figures or figurines as so fabricated ever pass to Miller of Puerto Rico; that under the agreement and arrangement between Miller of Illinois and Miller of Puerto Rico, Miller of Puerto Rico was only to be paid for its services in fabricating the finished products; and that notwithstanding the fact that title to the molds, materials and fabricated products were in Miller of Illinois, plaintiff wrongfully and illegally, and without authority and consent of defendant on, to wit, December 14, 1954, seized, misappropriated, sold and disposed of property of defendant located in the plaintiff's factory building of the fair cash market value of $25,482.80, and prayed judgment in this amount. The plaintiff denied the allegations by way of reply.

The Miller of Illinois is a going concern, having been in business in Quincy, Illinois for many years, prior to the organization of the Puerto Rico Corporation, and on December 9, 1946. The Puerto Rico Miller Corporation was organized in July, 1952. Prior to this time J. H. Miller learned through advertising of plaintiff that tax savings could be made under the Internal Revenue Laws by corporations of Puerto Rico, doing business there. After conferring with agents of plaintiff corporation he decided to organize a corporation in Puerto Rico under Puerto Rican law. Apparently his purpose in so organizing a Puerto Rico Corporation was to procure the benefit of the favorable law. The place of business of this Corporation was in San Juan, Puerto Rico. On July 23, 1952, this Corporation executed a chattel mortgage and note for $49,250. This note and mortgage is not involved here, except as the sale under the chattel is involved. This mortgage had as its security certain chattel property. The mortgage was legally foreclosed under the laws of Puerto Rico. Also a judgment was entered in the Superior Court of Puerto Rico, and the property of the Puerto Rico Corporation was legally sold under the process of this Court, and credit for this sale was given to the Puerto Rico Corporation for the net proceeds of this sale. These proceedings were regular in all particulars and in accordance with the Laws of Puerto Rico. The defendant had notice of the attachment judgment and chattel mortgage sales and could have protected the property values

if it so desired. Accordingly the contention of defendant that these sales were improperly held and that these sales of property under the process of these courts for less than market value, were illegal and void has no force.

█ Defendant also makes the contention that the act of the president of defendant in guaranteeing the payment of the rent under the lease was ultra vires. The evidence in the record shows that John H. Miller and his wife, Shirley A. Miller owned all but one share of the capital stock of the Illinois guaranteeing company, and that she permitted her husband to have complete control of the management of this company. The record further shows that J. H. Miller owned a majority of the capital stock of Puerto Rico Miller Company. The wife knew of the Puerto Rico Miller Company. The record does not show that she owned any of the capital stock of Puerto Rico Miller Company, but it does show that he had complete management control of both companies. The charter of Miller of Illinois shows 250 shares of authorized stock, par value of $100.00 per share, total capitalization, $25,000. The facts concerning the stock ownership, officers and directors of J. H. Miller Manufacturing Corporation (Illinois) are as follows: J. H. Miller, Director, President and Treasurer, 100 shares; C. J. Majerus, Director and Vice-President, 1 share; Shirley A. Miller, wife of J. H. Miller, Director and Assistant Secretary, 149 shares; and B. M. Geers, Secretary, without share ownership. Shirley A. Miller, the principal stockholder, testified that J. H. Miller, her husband, ran the Corporation, and what he did had her approval; the shareowners, officers and directors of J. H. Miller Manufacturing Company of Puerto Rico are as follows: J. H. Miller, Director, President and Treasurer, 650 shares; Max E. Miller, Director, First Vice-President and Secretary, 230 shares; and Eugene M. Miller, Director, Second Vice-President and Assistant Treasurer, 120 shares. It is evident that J. H. Miller and Shirley A. Miller had the controlling

interest of Miller of Illinois, and that J. H. Miller had the controlling interest of Miller of Puerto Rico. Under this status of control J. H. Miller executed the lease in question on behalf of Miller of Puerto Rico and guaranteed the lease on behalf of Miller of Illinois. The evidence shows that there was no Board of Directors' meeting of Miller of Illinois authorizing the execution of the guaranty agreement, and that J. H. Miller took upon himself the execution of this guaranty agreement; that he, with the consent of his wife, had complete control of the management of Miller of Illinois. Likewise he was the controlling owner and manager of Miller of Puerto Rico, and it can be said from this record without dispute that he had complete control of the business management of both Corporations. The plea against the rent guaranty is that the act of signing the guaranty agreement was ultra vires.

The defense of ultra vires was at one time permitted by the law of Illinois. However, since July 1, 1933, the defense is practically cut off, Section 157.8, Business Corporation Act, Chap. 32, I.R.S. 1957, Smith-Hurd A.S. Chap. 32, Sec. 157.8, as amended on the above date provides as follows:

"No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer, but such lack of capacity or power may be asserted:

"(a) In a proceeding by a shareholder against the corporation to enjoin the doing of any act or acts or the transfer of real or personal property by or to the corporation. If the unauthorized acts or transfer sought to be enjoined are being, or are to be, performed or made pursuant to any contract to which the corporation is a party, the court may, if all the parties to the contract are parties to the proceeding and if it deems the same to be equitable,

set aside and enjoin the performance of such contract, and in so doing shall allow to the corporation or the other parties, as the case may be, compensation for the loss or damage sustained by either of them which may result from the action of the court in setting aside and enjoining the performance of such contract, but anticipated profits to be derived from the performance of such contract shall not be awarded by the court as a loss or damage sustained.

"(b) In a proceeding by the corporation, whether acting directly or through a receiver, trustee, or other legal representative, or through the shareholders in a representative suit, against the officers or directors of the corporation for exceeding their authority.

"(c) In a proceeding by the State, as provided in this Act, to dissolve the corporation, or in a proceeding by the State to enjoin the corporation from the transaction of unauthorized business."

The Statute defines three ways in which an ultra vires act may be attacked. None of these provisions are applicable here in a suit to enforce the guaranteed rent provision of the lease sued on. Even prior to the statute in a closely held corporation, the courts of Illinois have denied the defense. Royal Drug Co., Inc. v. Levin, 273 Ill.App. 231; Jaffe v. Chicago Warehouse Lumber Co., 4 Ill.App.2d 415, 124 N.E.2d 618.

The theory of the third defense is that of appropriation and conversion of property of defendant. Defendant relies on this by way of confession, and avoidance of plaintiff's claim for rent, and by which it seeks to offset the claim of plaintiff and on which it also relies in support of the counterclaim. This defense depends upon the evidence.

Max Miller, Secretary, stockholder and director of Miller of Puerto Rico, was called as a witness for the defendant. He stated that he is a brother of J. H. Miller, was Secretary of Miller of Puerto Rico, and that he was familiar with the various equipment, materials in the process of manufacture and completed materials on the premises of Miller of Puerto Rico; that he was a full time employee at the Plant at Puerto Rico, and was there five to six days a week; that his employment was discontinued when Pridco, by its agent, Pablos Matos, locked the doors and took his key on June 29, 1954; that he was present at the Plant the day previous to locking up the Plant, and for some days prior thereto. He was handed Exhibit A, which was composed of a listing of property attached to Interrogatory 13. This list contained some 54 items describing various molds which had a value listed thereon of $8,789.59. This listing also contained miscellaneous materials for copyrighted scatter plaques of the value of $2,122.24, advances for raw material, and goods in process inventory of the value of $13,303.50, and prepaid inventory of the value of $1,267.44, total valuation, $25,482.80. He stated that the molds have a value of $8,135, were on the premises of the Miller of Puerto Rico at the time Mr. Pablos Matos locked it up; that these molds were owned by the J. H. Miller Manufacturing Corporation of Illinois; that the accountant and the witness had just completed taking an inventory and this inventory showed the molds to be on the premises at the time Pablos Matos locked up the Plant; that these molds were owned by Miller of Illinois and were never owned by Miller of Puerto Rico. He also identified the miscellaneous materials for copyrighted scatter plaques which he stated had a value of $2,122.40; that these were also on the premises at the time of the closing of the Plant, and were the property of Miller of Illinois. This item consisted of articles such as pressure stickers that went on the back of plaques, printed cards on which the cast and decorated plaques were mounted, and polyethylene bags in which they were packed, and many of the materials that also went into the assembly of these plaques; that all of the items represented were paid

for and owned by Miller of Illinois, and that these materials were on the premises when the Plant was locked up by Pablos Matos on the 29th of June, 1954.

In reference to the goods in process inventory shown on Exhibit A totalling $13,303.53, this witness said that this item was for raw materials and goods in process inventory, and consisted of over 460 bags of art casting plaster, $1,900 worth of mask rubber used for casting masks which was owned and processed by Miller of Illinois, and sent to Miller of Puerto Rico for certain types of processing; that there were many gallons of paint shown upon the inventory by Mr. Cassiona, the accountant, and I at the end of the month, all of which was purchased by the Corporation in Illinois; that it was a special type of paint unavailable in Puerto Rico and was used for the finishing of certain items such as masks and plaques, and all that material was there, and all of these materials had a value of $13,303, and he knew this because of his knowledge of the value of such materials; that the prepaid inventory item of $1,267.44 consisted of china craft paint which was manufactured, bottled and labelled in the plant of the Illinois Corporation and this is proven by Exhibit 4, an invoice in evidence, showing Miller Craft Paint product, and showing a value of $1,267.44, and this was the property of Miller of Illinois and was on the premises at the time Pablos Matos took over and locked up the Plant. He further stated that all of these items having a total value of $25,482.80 were there on the premises when Mr. Matos took possession; that he did not know what happened to them, that he was locked out and unable to get in the building; that Mr. Pablos Matos held an official capacity with Pridco and that his title was Special Service Agent attached to the office of the Chief of the Accounting Department, and that his duties were mainly to deliver to industrialists all the buildings when completed, the following-up of the collection of rent due, the sale of surplus property belonging to Pridco, and other incidental services of like nature; that the valuation that he placed on the above mentioned items of property were the values exclusive of the cost of shipping; that Matos was also appointed Custodian of said property by the Superior Court of Puerto Rico; that after he became custodian he maintained his official capacity, because this witness called on him several times at his office in the Fomento Building where the offices of Pridco are located, in an attempt to make arrangements for a meeting at Manati where the Plant was located, so that he could get into the building for the purpose of purchasing some of the items and for the purpose of salvaging some of the personal effects of employees of the Company which had been locked up; that after four calls he was permitted to go into the building to remove an automatic clothes washing machine; that at this time the witness pointed out to Pablos Matos that the jeep truck did not belong to either Miller of Illinois or Miller of Puerto Rico.

The witness also stated that he inquired about making a bid for a number of items such as spray guns, castings and air conditioners, but that Mr. Matos told him that he would have to wait until the chattel mortgage property sale before he could make a bid; that he was later told in a conversation in the office of Pablos Matos in the Fomento Building as the sale date was approaching, that the witness could come to the sale, but that there would be little point in so doing because the entire lot would be purchased at the chattel mortgage sale by Pridco, that I could come if I thought I could bid against Pridco; that he notified his brother, J. H. Miller, who was in the States, that they had been locked out and further stated that they had property of other persons and individuals in addition to the property of Puerto Rico Corporation and Illinois Corporation locked up; that he had heard read the answer of Mr. Matos contained in his deposition, the answer to Interrogatory 17. The Interrogatory and Mr. Matos' answer is quoted as follows:

"Interrogatory No. 17: Exhibited to you herewith is a copy of a

letter dated August 31, 1954, addressed to Puerto Rico Industrial Development Company and signed by Max Miller on behalf of J. H. Miller Manufacturing Corporation of Puerto Rico. Please state whether you have seen the original of this letter and if so, the time, place and circumstances.

"Answer: Mr. Max Miller asked for an appointment with Attorney Guillermo Silva, representing Puerto Rico Industrial Development Company and said appointment was set for August 31, 1954 at the office of said attorney. Mr. Max Miller expressed his desire to surrender possession of the building because operation had ceased even before the attachment of the property and in order not to incur into any further liability for the payment of rent. The letter was prepared by Mr. Max Miller and Mr. Silva jointly and transcribed by one of the secretaries of Mr. Silva, and Mr. Miller read it and proceeded to sign it in the presence of both Mr. Silva and myself."

In answer to what he said in that Interrogatory it is not true that the letter of surrender was prepared by me and Mr. Silva jointly. The letter of surrender, Exhibit No. 9, was signed by me. The facts and circumstances surrounding the signing of that letter by me are as follows: Mr. Matos had gone to my home once and he met me at the Post Office in San Juan with a Marshal of the Superior Court of Puerto Rico and served me with a summons. He came with the same Marshal to my home with this letter and said I should sign this letter, and I objected because I said I could see no reason for my saying I was willfully giving this stuff up. I had been locked out then for a month. The persons there were Mr. Matos and the Marshal of the Superior Court of San Juan. I objected very strenuously to signing this, and didn't see where I was in any way obligated to. He said, "You are locked out. The locks are changed on the building. You have no way of getting in and it makes no sense at all in your not signing this and saying that you have turned it over to us, because in every effect that is exactly what the situation is."

It still made no sense to me, but I didn't like the Marshal of the Court standing there, and I had gone through this twice before so I signed it. The letter was not prepared by me, and I never saw the letter until it was brought to me by Mr. Matos. It was not prepared by me in conjunction with Mr. Silva and the statement of Mr. Matos in that regard is absolutely a lie. This letter is in the words and figures following, to wit:

"San Juan, Puerto Rico
"August 31, 1954
"Puerto Rico Industrial Development Co.
"Banco Popular Building, Stop 22
"Santurce, Puerto Rico.
"Gentlemen:
"In connection with the main factory building and the warehouse building occupied by us under a lease contract with your goodselves, and located at Barrio Coto Norte, Municipality of Manati, Puerto Rico, inasmuch as we have ceased operations at our factory and the mortgage upon the machinery has been foreclosed and all other chattels have been attached in a law suit filed for the collection of rent due, we are hereby surrendering said premises and giving immediate possession thereof to your company.
"Yours very truly,
"J] H] · Miller Manufacturing Corp. of Puerto Rico
"Per Max Miller
"Secretary"

A reading of the above letter shows that its only purpose was to surrender the building and that the letter of surrender did not include any property of defendant or any other person that was located in the building.

Inquiry was made of this witness as to who had locked up the building, the Court Marshal or Pridco, and the witness stated that the building was locked up by Mr. Pablos Matos of Pridco; that he had picked up a Marshal of the Superior Court and was starting out to Manati; that the Marshal and Matos ran into the witness at the Post Office at San Juan, and served a summons and asked the witness to go out to Manati and meet them there. They told me they would meet me and another party who had appraised the goods and who had helped take the inventory which I mentioned in my testimony previously. I met them there and we went over the entire list of property covered by the chattel mortgage. Everything on this list checked right down to the serial numbers, except for a flexible shaft which was missing. An inventory had previously been taken of the entire place, including the property securing the chattel mortgage, and all other property that the witness protested to them about locking him out with all the other property there; that they assured the witness they would keep a watchman on duty and that the witness could come out at any time and inspect it and that they were not going to confiscate any property that was not theirs. At this time we walked over the entire building and identified everything that was in there. This was done with Mr. Matos, the marshal, this other man and me. When we walked out the door Mr. Matos took my key and locked the door and he kept the key; that Mr. Matos let him back into the building on one occasion to get the clothes washing machine. In response to a question asked by the Court, "Did Mr. Matos have pointed out to him what property did belong to Miller Company of Puerto Rico?", to which the witness replied, "They had absolutely everything pointed out to them the day that I surrendered the building, because we went through the entire Plant and I wanted to know about these raw materials, paints and plaster, and items that were supposed to go into the production of material for the Illinois Corporation. The property on the inventory is consumable property with the exception of molds, raw materials and a certain amount of finished goods. Certain raw materials would have been consumed between April 1953 and June 30, 1954, but what I am talking about is the inventory taken on or about June 30, 1954, molds, unused raw materials and finished products. All these people, Mr. Matos, the marshal, the other party saw the list on the last day that we had possession of the plant, and this list consisted of molds which are non-consumable, raw materials for copyrighted scatter plaques, never finished into a product. The Court inquired, "Did Mr. Matos see these molds?", to which the witness responded, "Absolutely, they were stored. The ones that were out of use were on metal racks in a portion of the warehouse building, and many molds which had recently been planned for scatter plaques were in racks in the casting department of the production building. He saw them because there was a tremendous amount of stuff there which I pointed out to them, and which we had to search for and go through everything there to locate everything in the mortgage." He saw all these bags of plaster and they were counted. There were 460 bags of plaster. He saw the entire art department which consisted of very good drawing materials, tools and tables. Some of this drawing room equipment belonged to me and there were others that belonged to Miller of Puerto Rico, but these were not under the chattel mortgage. They said, "We are getting another paper down here. Don't you touch anything". Then there was another big group which consisted of molds and raw material. There were many, many gallons of lacquer made by a certain firm in Chicago which made special lacquer for this type of production, many bags of plaster, all the material that went into scatter plaques, over $1,000 worth of china craft paint all of which the Illinois Company was the owner. I felt responsible for this, and I pointed this out. I was assured, "Don't worry about this, we are going

to take just what we should." The Company ceased doing business as soon as they locked us out.

In reference to the molds listed in the interrogatories that I have in front of me, there was impressed on the outside of these molds, "Miller Manufacturing Company of Illinois". Both Mr. Matos and the marshal had this pointed out to them by me and I pointed out the things and articles that were not on the chattel mortgage and the things that did not belong to Miller of Puerto Rico.

When this witness was recalled he stated with reference to Plaintiff's Exhibit 5, in order to secure the effectiveness of a judgment, there are articles listed thereon that belong to Miller of Illinois, consisting of 488 bags of white art plaster, 460 of which were pointed out at the time of inventory. The value of this plaster was between three and four dollars per bag. Exhibit 15, which was the original book of entry of Pridco, was shown to the witness and he went through this book and stated that the book showed the sales of property seized at the Plant, and made after the foreclosure sale, and after the purchase on the judgment sale by Pridco; this book showed on one occasion the sale of 288 bags of plaster to Carlos Lopez; that other property that belonged to Miller of Illinois that the witness found in this book showed a sale to Carlos Lopez on December 2, 1954, Receipt No. 4899, one drum of masking rubber with a value very close to $800, also five 5-gallon cans of lacquer of the value of $22 per can; that afterwards the witness had been to the shop of Carlos L. Ortez and that he saw therein all this material of J. H. Miller Manufacturing Company of Illinois in a shop that was set up and owned by him.

Again referring to this original entry book of Pridco, he also found the sale of 100 bags of white plaster to Carlos Ortez on December 31, 1954 for $70, which was the plaster of Miller of Illinois. That again looking at the book, on January 1, 1955 the witness found the sale of another 100 bags of white plaster to Carlos Ortez which was the property of Miller of Illinois; that this plaster was sold for $50 and that he found two other items in this book, another sale to Carlos Ortez on January 14, 1955, one drum of rubber of the value of $800, and two kegs of lacquer, one-half used, worth from $21 to $24 per keg, depending on color. That he also found the sale of one lot of nativity molds which were not on the mortgage and were the property of Miller of Illinois. The certificate of sale, Plaintiff's Exhibit E, conducted by the Marshal on December 14, 1954, the judgment sale, shows the sale of 488 bags of white art plaster.

The book record of J. H. Miller Manufacturing Company of Illinois shows that it had advanced to Miller of Puerto Rico raw materials of the value of $61,578.53 as shown by Defendant's Exhibit 1. J. H. Miller and Max Miller stated that all raw materials were sent to the Puerto Rico Company for processing into finished products; that Miller of Puerto Rico was to manufacture the products and be paid for the service rendered; that the raw materials were at all times the property of the Illinois Company, and that at the time Pridco locked up the Plant the raw materials, molds, art plaster, paint, lacquer, etc., were all the property of Miller of Illinois; had an actual inventory value for the various items of personal property itemized as follows: molds, $8,135; raw materials, $13,303.-57, Miller Craft paint, $1,267.44; copyrighted scatter plaques, $2,122.24; total value, $24,828.25; that Pablos Matos, special service agent of Pridco, attached to the office of the Controller in the Department of Finance, at the time of and some three days prior to the locking up of the Plant, on June 29, 1954, had actual notice of the ownership of this property, and checked the inventory and personal property listed thereon, at or shortly before the Plant was closed. This inventory included among the items not included in the chattel mortgage, molds, plaster, masking rubber, lacquer and paint. Mr. Matos, in his deposition Interrogatory No. 9, was asked this question: "Please state whether you or the plaintiff took custody or possession of

any other property during November or December, 1954, and if so please describe the same, the owner thereof, if known, and please state the time and place?" His answer was, "Neither the plaintiff nor I took possession of any other property during November and December, 1954, or any time antecedent or subsequent thereto". The above question and answer concerned property other than that under the chattel mortgage. Again he was asked this question, Interrogatory 12, "While you were in custody of said property above mentioned, were any demands or requests for possession of said property, or the right to examine the same ever made upon you by J. H. Miller Manufacturing Corporation of Puerto Rico, J. H. Miller Manufacturing Corporation of Illinois, or John H. Miller? If so state the nature of such demand or request, by whom made, when and where made, and what action you took in connection therewith?" His answer was, "While I was in custody of the property attached no demands or requests for possession of said property or to examine the same were ever made upon me by J. H. Miller Manufacturing Corporation of Puerto Rico, or by J. H. Miller Corporation, (Illinois), or by John H. Miller." This witness knew Max Miller, the witness who testified in open Court on the hearing of this cause. Yet in his answer to the last quoted interrogatory he says nothing about having any request from Max Miller, nor does he in any way deny that Max Miller particularly pointed out to him the respective items of property which were definitely pointed out to him at the time he closed the Plant when he locked out Max Miller and took the key. In so far as this witness is concerned, this record shows that a Jeep automobile belonging to a person by the name of Sandstrum was there when he locked the Plant. The Marshal's sale shows that this jeep was sold by the Marshal to Pridco at the rent attachment sale, and that it was later sold by Pridco to a buyer in Puerto Rico for $700. This is disclosed by the original book of entries of Pridco in evidence in this case.

Also this record shows that at the same sale the Marshal sold to Pridco 488 bags of white art plaster. The evidence in this record shows that beyond question this was the property of Miller Company of Illinois, because the testimony of Max Miller is not in any wise denied by the party plaintiff or any witness for the party plaintiff. The actual court records from Puerto Rico show the sale of the Jeep and the art plaster. Yet Pablos Matos denies that he took over any property other than that under the chattel mortgage or that which belonged to Miller of Puerto Rico. The evidence given by Max Miller and John H. Miller concerning property taken over that did not belong to Miller of Puerto Rico stands unimpeached in this record. Their evidence is further supported by the book of original entry of Pridco showing the disposition of some of this property after acquisition at the sale of the Marshal. This book of Pridco, the book of original entries shows the sale of the Jeep, the sale of the plaster, the sale of the paint, the sale of the masking rubber to various parties in Puerto Rico, and Max Miller actually saw many items of this property on the premises of Carlos Lopez, and which consisted of 488 bags of plaster, a drum of masking rubber, lacquer, and plaster molds. The only witness other than Pablos Matos who answered the interrogatories above quoted who testified in open court for the plaintiff was Rafael Fabregas. This witness did not state anything concerning the disposition of the property by Pridco because he was not present in Puerto Rico at the time the Plant was closed and at the time the property was sold under attachment sale. He was not in a position to state anything concerning the acquisition of the property by Pridco except to point out what the original book of entries showed.

I find the following facts from the evidence in the record and from inferences that can be drawn therefrom:

(1) That Pridco, by its agent, Pablos Matos, when it locked up the plant on June 29, 1954, or by the attachment sale, or by the chattel mortgage sale, acquired

and took possession of property that did not belong to Miller of Puerto Rico, but did belong to Miller of Illinois, and that the value of the property so taken is $24,482.80 as of the date that the property was unlawfully seized; that Pablos Matos was an agent, servant and employee of Pridco, and by reason thereof, Pridco, itself, had actual knowledge that the above property was the property of Miller of Illinois; that after June 29, 1954, Miller of Illinois had no representative in Puerto Rico who could look after this property except Max Miller, who was a brother of J. H. Miller, President of Miller of Illinois; that access to the Plant was refused to Max Miller after the above date, except on one occasion when he was permitted to take out of the leased building an automatic clothes washing machine of an employee of the Miller of Puerto Rico.

(2) That Miller of Illinois did not, by any affirmative act, do anything to recover its personal property by taking any legal action in Puerto Rico, and in fact J. H. Miller, as President of Miller of Illinois, purposely refused to go to Puerto Rico to protect the rights of the Illinois Corporation by reason of the fact that he feared unfavorable legal action against him in Puerto Rico, or that he feared Pridco would commence legal action against him in Puerto Rico by personal service of process and thereby procure a personal judgment against him or Miller of Illinois.

(3) That Max Miller was an officer and employee of Miller of Puerto Rico and was not an officer, servant, agent or employee of Miller of Illinois, and when Miller of Puerto Rico was locked out of the Plant, he had no authority or capacity to take any action on behalf of Miller of Illinois; that he did, however, notify J. H. Miller, President of Miller of Illinois that the Plant was locked up, which gave notice to Miller of Illinois that its property was also locked in the Plant, and that as of June 29, 1954, Max Miller was refused the right to and effectively prevented from removing any property in the factory building outside of the permission granted by Pridco to remove the clothes washing machine.

(4) That between June 29, 1954, until the time of the commencement of this action on July 20, 1955, Miller of Illinois took no affirmative action to protect its rights; that although Pridco had actual knowledge that the property above mentioned belonged to Miller of Illinois, it took no affirmative action in Puerto Rico to try to assert legal process against Miller of Illinois under the guaranty provisions of the contract of lease; that Miller of Illinois, having knowledge of the two sales, the one, the chattel mortgage sale, on September 29, 1954, and the other, the attachment of judgment sale, on December 14, 1954, and its President, J. H. Miller, did nothing to protect any right of property.

(5) That as of June 29, 1954, plaintiff was entitled to the possession of the building and had every right to make it tenantable for a new tenant, which right of possession carried with it the legal right to furnish to any new tenant a clean and unobstructed building.

(6) That some of the property of Miller of Illinois definitely was sold to Pridco at the Marshal's sale on December 14, 1954; that Pridco after acquiring possession either on June 29, 1954, or by the chattel mortgage sale or by the attachment judgment sale, and after December 14, 1954, sold some of the property of Miller of Illinois to various persons in Puerto Rico;

(7) That the property of Miller of Illinois had the above found value to it as a going manufacturing concern in Illinois because of the peculiarly specialized nature of the product it manufactured, but that the value to anyone in Puerto Rico would not be as great because there was no one in Puerto Rico who had the know-how of its use, nor was anyone there peculiarly trained in its use. Consequently most of the property loaned to Miller of Puerto Rico and as seized by Pridco had little value on the open market there as disclosed by Pridco's book record showing the small price of its sale value in December of 1954 and January of 1955.

The law of trover and conversion is that one who knowingly takes posses-

sion of personal property that belongs to another such as disclosed by the facts in this record is liable to the person whose property it appropriates, whether demand for the return of the property is made or not, and that the act of Pridco, through its agent, Pablos Matos, in locking the Plant, with refusal of the right to remove the personal property in question, amounts to conversion for which it is ordinarily liable. City of Elgin v. Goff, 38 Ill.App. 362, 364; 53 Am. Jur., Trover & Conversion, Par. 88, p. 880; 35 Ill. Law and Practice, Trover and Conversion, par. 6, p. 150; Deane v. Fort Dearborn T. & S. Bank, 241 Ill. App. 517, 518; National Bond & Investment Co. v. Zakos, 230 Ill.App. 608, 612; Union Stock Yard & Transit Co. v. Mallory, etc., Co., 157 Ill. 554, 563, 41 N. E. 888; Genuine Panama Hat Works v. Paragon Hat Co., 245 Ill.App. 531, 542; Campau v. Bemis, 35 Ill.App. 37, 44; Dolejs v. Lietuva Bldg. and Loan Ass'n, 305 Ill.App. 498, 26 N.E.2d 419.

The plaintiff's, Pridco's claim for rent is $11,557.13; the value of the property of Miller of Illinois for its own uses and purposes on June 29, 1954 was $25,482.-80; accordingly out of this latter sum I deduct Pridco's claim for rent and allow it as a set off against the claim for rent, and hold that Pridco the plaintiff, by reason thereof, is not entitled to the amount claimed. To do otherwise would be to work a rank injustice against the defendant, because if this property had been surrendered by Pridco on or shortly after June 27, 1954, Max Miller could have shipped the property back to Miller of Illinois, and judgment is hereby entered on the complaint that the plaintiff take nothing by its suit and that the defendant go hence without day. Dolejs v. Lietuva Bldg. & Loan Ass'n, supra.

■■ The next thing to be disposed of is the counterclaim of defendant on which a finding could be made in favor of the defendant on the counterclaim for the balance of $13,925.67. The law has been examined in the light of the facts as hereinabove found. The counterclaim sounds in trover for the conversion of the goods.

"Trover is an equitable action, and the rule frequently upheld is that the plaintiff can recover damages only to the extent of the injury actually sustained. Thus if the mortgagee bring trover against the mortgagor, he can recover only the amount of the debt, and where an executor de son tort is sued in trover by the rightful administrator, he may show in mitigation of damages that he paid debts which the administrator would be bound to pay, and if such payments equal the value of the property converted, the administrator will recover only nominal damages. 1 Williams on Executors, 144. If the action in this case was against the factor it would not be questioned but that the amount advanced by him upon the goods might be recouped from the value of the goods which the plaintiff would be entitled to recover. This has been frequently done in actions brought to recover from a pledgee. Ja[r]vis v. Rogers, 15 Mass. 389; Stearns v. Marsh, 4 Denio, 227; Story on Bailments, Sec. 349, and case cited. The right to recoup does not rest upon the principle of lien. It exists after the lien has been destroyed by a tortious act of the party in whose favor it originally obtained, the sole object of the law in awarding damages to a plaintiff being to compensate him for the injury he has suffered from the wrongful act of the defendant. The tortious pledge of the goods by the factor is not, in form, an assignment to the pledgee of the factor's claim against the principal for advances, but it certainly operates to transfer as between the factor and the pledgee, all rights which exist to have damages for the tortious act mitigated as against the principal.

"This doctrine was applied by our Supreme Court in the case of Belden v. Perkins, 78 Ill. 449.

"A demurrer was sustained to the answer and on appeal the Supreme Court reversed the case, after a very

full review of authorities, taking the ground that such equitable defense must be clearly admissible under the code, as the manifest equity and justice of the cases had carried the doctrine so far at common law 'that equitable defense by way of recoupment or equitable set-off has been entertained and made effectual in actions of trover. While saying the factor had no right to pledge the goods of his principal, the court have with great unanimity allowed the amount sought to be recovered of the innocent pledgee of the factor to be reduced by sums justly due from the principal to his factor. Wherever the action sounds in damages, the plaintiff is restricted in his recovery to the damages actually sustained.' " Ludden v. Buffalo Batting Co., 22 Ill.App. 415 at page 421.

In cases sounding in trover to mitigate damages, the courts of Illinois have applied equitable doctrine. Apply equitable principles to the facts upon which this counterclaim is based. By entering judgment against the plaintiff, the defendant has been protected against the wrongful act of conversion by the recoupment that has been allowed against and to the extent of the recovery of any rent and for the value of the property were it in use in the plant at Quincy, Illinois. However while the title to the property remained in Miller of Illinois, Miller of Illinois loaned this property to Miller of Puerto Rico; after Miller of Puerto Rico failed to pay rent, Pridco was entitled to possession of its factory building which it had erected for Miller of Puerto Rico at great expense; Pridco had a legal right to foreclose on the chattel mortgage, a legal right to sue by attachment against any property that Miller of Puerto Rico had; it exercised these legal rights and gave Miller of Puerto Rico credit for the sale value of its property at the chattel mortgage sale and at the attachment judgment sale; after these sales, the last of which occurred on December 14, 1954, it also had a legal right to rent its property to some other tenant under the law of Puerto Rico, and this right included the right to furnish an uninhabited plant free from property storage of any person.

It is also an undisputed fact that Miller of Illinois knew of the locking up of the plant because knowledge was brought to the President of this Company; the President of Miller of Puerto Rico was in the same capacity with Miller of Illinois; he knew that the accrued rent was unpaid; he knew that if he was to protect the property of Miller of Illinois located in this plant, Miller of Illinois would have to act affirmatively and without delay in moving this property, yet he took no action to protect this property; the evidence in this record shows that the chattel mortgage property had a value at the time of the mortgage execution to a going concern of approximately $49,250. This property on the foreclosure sale was bid in for $7,500, and was actually sold for $9,783.25 to various purchasers in order to liquidate it into cash; Miller of Illinois also knew that Pridco had erected for Miller of Puerto Rico the factory building at a cost of $250,000; Miller of Illinois, Miller of Puerto Rico and John H. Miller personally knew that all three were invited to Puerto Rico to try to work out the financial difficulties of Puerto Rico, yet J. H. Miller refused to go to Puerto Rico because of fear of personal service in Puerto Rico and personal judgment there because of the defaults in the chattel mortgage note and accrued rental under the lease, and knowing these things, Miller of Illinois failed to act affirmatively to protect its property, which under forced judicial and foreclosure sales, and under the economic status and lack of know-how in its use, the property could bring only a small portion of its actual cost; further this record shows that Pridco, even under this record showing the conversion, got little if any of the actual value for itself and the probabilities are that the property in question, if preserved by Pridco in storage, would hardly have

brought its storage cost because of the specialized nature of its use; there was no duty on Pridco to return this property to Illinois, nor was there any duty to preserve this property. Miller of Illinois could have had no grounds to complain if Pridco had removed this property outside of the plant. The duty to protect this property was on Miller of Illinois. Miller of Illinois had a period of time from June 29, 1954 to Sept. 21, 1954, or even to December 14, 1954, to commence action against Pridco for the conversion or appropriation of the property involved in the counterclaim. This, after notice, it negligently failed to do, and by reason of its own conduct and further by its cause of conduct, Miller of Illinois led Pridco into the belief that it was willing to abandon this property in order to avoid the process of the courts of Puerto Rico. Pridco attempted to aid Miller of Illinois by extension of time of the foreclosure sale. Under the law of Puerto Rico the chattel mortgage sale could have occurred within ten days of the seizure of the property under the chattel mortgage law of Puerto Rico which sale could have occurred in early July, 1954. Time was extended to September 21, 1954, as shown by letters and communications in this record from Pridco to Miller of Illinois. In spite of this Miller of Illinois stayed out of Puerto Rico, the effect of which led Pridco to believe that the property was abandoned.

As between Miller of Illinois and Miller of Puerto Rico, the status of the property involved created the relationship of bailor and bailee. 6 Am.Jur. Bailments, Sec. 30, p. 192. At the time the plant was locked up by Pridco on June 29, 1954, it took possession of this property by its act of conversion, Pridco involuntarily took the place of Miller of Puerto Rico and assumed the same relationship, that of bailee of the property. 6 Am.Jur. Bailments, Par. 88, p. 238, 239, wherein it is said,

"The duty of one who, on taking possession of a building, finds in it personal property apparently abandoned by a former occupant, depends upon its value to the eyes of a reasonable man in his position, and not upon the value it may later be shown to have."

In Amberg v. Philbrick, 33 Ill. App. 200, an action of trover for chattels belonging to the plaintiff of which the defendant had such possession as resulted from putting a man in charge of the premises in which the plaintiff had placed them, the court, describing the defendant *as an involuntary, gratuitous bailee*, held that he was not liable for the refusal of the servant to deliver the chattels, when he had not been informed that application had been made therefor, and had given no orders in regard thereto. That Pridco was a voluntary, gratuitous bailee, see also Norris v. Camp, 10 Cir., 144 F.2d 1, 3 and 4; Richards v. Fulton, 6 Cir., 75 F.2d 853, 854; Mellon National Bank v. Citizens Bank & Trust Co., 8 Cir., 88 F.2d 128, 132.

It is generally held that any unauthorized attempt on the part of a bailee by sale, lease, pledge or otherwise, to transfer the title or possession of the subject matter of the bailment constitutes a conversion thereof. Jacobs v. Grossman, 310 Ill. 247, 250, 251, 141 N.E. 714. See also 6 Am.Jur. Bailments, Sec. 125, p. 260. However there is a corollary to this rule. A bailor may be estopped to assert his title where the true owner by his own direct voluntary act, confers on the bailee authority to dispose of the property title to which he ostensibly vests in the bailee. Thus in situations where the bailor has dealt with the property or refuses to deal with the property and knowingly permits the other party to act as shown by the facts in this case, the law is as follows:

In 19 Am.Jur., Sec. 34, p. 634, it is said:

"Equitable estoppel or estoppel in pais is a term applied to a situation where, because of something which he has done, or omitted to do, a party is denied the right to plead or prove an otherwise important fact."

And again, in 19 Am.Jur., Sec. 39, p. 637, it is said:

"The proper function of equitable estoppel is the prevention of fraud, actual or constructive, and the doctrine should always be applied so as to promote the ends of justice and accomplish that which ought to be done between man and man. Such an estoppel cannot arise against a party except when justice to the rights of others demands it, and when to refuse it would be inequitable. Hence, in determining the application of the doctrine, the counter equities of the parties are entitled to due consideration. It is available only in defense of a legal or equitable right or claim made in good faith and can never be asserted to uphold crime, fraud, injustice or wrong of any character."

And again in 19 Am.Jur., Sec. 40, p. 639, this Encyclopedia of Law says:

"The effect of an estoppel in pais is to prevent the assertion of what would otherwise be an unequivocal right or to preclude what would otherwise be a good offense. Such estoppel operates always as a shield, never as a sword. In other words it is a conservator or a means of repose. Its office is not to work a positive gain to a party, and it does not of itself create a new right or give a cause of action, but it serves to prevent losses otherwise inescapable and to preserve rights already acquired. * * * The practical effect of preventing the unconscious and inequitable assertion or enforcement by the party estopped of claims or rights which might otherwise exist or be enforcible may be to create and vest opposing rights in the party asserting the estoppel."

Also it is said in 19 Am.Jur., Sec. 42, p. 640:

"The doctrine of estoppel in pais is founded upon principles of morality and fair dealing and is intended to subserve the ends of justice. It always presupposes error on one side and fault or fraud upon the other and some defect of which it would be inequitable for the party against whom the doctrine is asserted to take advantage. It concludes the truth in order to prevent fraud and falsehood and imposes silence upon the party only when in conscience and honesty he should not be allowed to speak. Estoppel of this character arises from the conduct of a party, using the word 'conduct' in its broadest meaning as including his spoken words, his positive acts, and his silence when there is a duty to speak and proceeds on the consideration that the author of a misfortune shall not himself escape the consequences and cast the burden on another."

And lastly for the purpose of this opinion, 19 Am.Jur., Sec. 49, p. 648, says:

"It is essential to the doctrine of equitable estoppel that the party sought to be estopped should have had knowledge of the facts, or at least he should have had the means at hand of knowing all the facts, or have been in such a position that he ought to have known them. This rule applies with particular force where the estoppel is claimed by reason of silence or inaction. * * *"

Thus under the principles above announced, and applying these equitable principles under the facts in this record, Miller of Illinois will not be permitted to pursue aggressively the action as contended for in its counterclaim.

The facts as hereinabove found are adopted as and for findings of fact and judgment is denied on the counterclaim and judgment on the counterclaim is entered in favor of counter-defendant that the counter-plaintiff take nothing by his counterclaim, and plaintiff to take nothing by its original suit.